_Brenda Mwhery_

**Brenda Moody Whinery, Chief Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re: | Chapter 11 Proceeding |
| RONDA SNEVA,<br>R&G FOOD SERVICES, INC. dba<br>LATITUDE CATERING, | Case No. 4:15-bk-13185-BMW<br>4:15-bk-13187-BMW |
| Debtor. | (Jointly Administered) |
| RONDA SNEVA, | Adv. Case No. 4:17-ap-00624-BMW |
| Plaintiff, | **MEMORANDUM DECISION** |
| v. | |
| R&G FOOD SERVICES, INC. dba<br>LATITUDE CATERING, | |
| Defendant. | |

I.    <u>**Introduction**</u>

This matter came before the Court pursuant to the *Complaint* (Dkt. 1) filed by the Plaintiff, Ronda Sneva, in which Ms. Sneva asserts that the Defendant, R&G Food Services, Inc. dba Latitude Catering ("R&G" or the "Company"): (1) breached that certain Employment Agreement between R&G, as the employer, and Ronda Sneva, as the employee, which became effective October 1, 2016 (the "Agreement") (TE 1);[1] (2) breached the confirmed *Second Amended Joint*

---

[1] References to exhibits admitted into evidence at trial are indicated by "TE __," with pincites to sections, page numbers, and/or Bates stamps when applicable.

*Plan of Reorganization* (the "Plan") (Admin. Dkt. 481);[2] (3) breached the covenant of good faith and fair dealing; and (4) terminated her employment "not for cause." Ms. Sneva asks the Court to: (1) award her (a) damages in an amount to be proven at trial, but in no event less than $1.2 million, (b) reasonable attorneys' fees and costs pursuant to the Agreement and A.R.S. §§ 12-341 and 341.01, and (c) pre- and post-judgment interest on the foregoing award; and (2) determine that Ms. Sneva was not terminated "for cause" and is entitled to all associated rights provided for under the Agreement, the *Amended and Restated Shareholder Agreement* entered into by and among R&G, Ronda Sneva, Jennifer M. Moulton ("Ms. Moulton"), Anthony J. Williams ("Mr. Williams"), Holly J. Lippert ("Ms. Lippert"), and Frank J. Campagna ("Mr. Campagna") (the "Shareholder Agreement") (TE 3), and the Plan.

R&G denies breaching the Agreement, breaching the covenant of good faith and fair dealing, and terminating Ms. Sneva without cause. (Dkt. 6). R&G asks the Court to dismiss the Complaint for failure to state a claim upon which relief can be granted and for lack of jurisdiction, and to award R&G its reasonable attorneys' fees and costs. (Dkt. 6).

A trial was held on March 20-22, 2018, at which time the parties presented evidence and oral argument. Testimony was provided by Ms. Sneva; R&G President, Ms. Moulton; R&G Chief Executive Officer ("CEO"), Jay Moulton ("Mr. Moulton"); former R&G Chief Restructuring Officer, Christopher Linscott ("Mr. Linscott"); R&G general manager and former spouse of Ms. Sneva, Gary Sneva ("Mr. Sneva"); R&G minority shareholder, Mr. Campagna; and former R&G employee and son of Ms. Sneva, Corbett Sneva. At the conclusion of the trial, the Court allowed the parties to submit post-trial briefs. The parties filed post-trial briefs on April 12, 2018, at which time the Court took this matter under advisement. Based on the pleadings, testimony offered, exhibits entered into evidence, and entire record before the Court, the Court now issues its decision.

## II.    <u>Jurisdiction</u>

Pursuant to the Court's September 20, 2017 oral ruling (Admin. Dkt. 671) and September

---

[2] References to the "Admin. Dkt." are references to docket entries on the administrative docket, case number 4:15-bk-13185-BMW, of which the Court will take judicial notice.

25, 2017 *Order Re: Sneva's Emergency Motion to Enforce Chapter 11 Plan* (Admin. Dkt. 678), the Court retains post-confirmation jurisdiction to determine this matter. Furthermore, the Court may enter declaratory relief pursuant to 28 U.S.C. §§ 2201-2202 and Federal Rule of Bankruptcy Procedure 7001. This ruling constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as incorporated by Federal Rule of Bankruptcy Procedure 7052.

## III. <u>Issues</u>

The parties have agreed that the Court, at this time, is only determining liability, specifically: (1) whether either party breached the Agreement; (2) whether either party breached the covenant of good faith and fair dealing; and (3) whether Ms. Sneva was terminated for cause.[3]

## IV. <u>Factual and Procedural Background</u>

### A. Bankruptcy Proceedings

1. In 1986, Ms. Sneva and her ex-husband, Mr. Sneva, founded R&G, a privately held Arizona corporation headquartered in Tucson, Arizona. R&G is an emergency food services company primarily in the business of providing prepared food, drinks, and other related relief to firefighters and aid workers at natural disaster sites throughout the country. R&G's revenue is primarily generated from service contracts with: 1) federal agencies, including the United States Department of Agriculture ("USDA"), the United States Forest Service ("USFS"), and the Federal Emergency Management Agency ("FEMA"); 2) state agencies, such as the Arizona Department of Forestry ("ADF"); and 3) non-profit organizations. (Admin. Dkt. 480 at 10).

2. On October 14, 2015, Ms. Sneva, individually, and R&G filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

3. At that time, Ms. Sneva was the sole shareholder, President, and CEO of R&G, and the primary guarantor of the majority of R&G's pre-petition debt.

4. On October 20, 2015, the Court entered an order directing the joint administration of Ms. Sneva's and R&G's bankruptcy cases. (Admin. Dkt. 17).

---

[3] The parties agreed at a status hearing on Ms. Sneva's *Emergency Motion to Enforce Chapter 11 Plan* (Admin. Dkt. 649) to determine damages, if any, after a determination of liability. (*See* Admin. Dkt. 679).

5. During the course of the Chapter 11 proceedings, Ms. Sneva and R&G located a strategic partner, World Dining LLC ("World Dining"). World Dining acquired the secured debt held by Wells Fargo Bank, which gave it all rights under the Wells Fargo loan documents and a claim in the R&G bankruptcy case.

6. On or about August 5, 2016, Ms. Sneva relocated from Tucson, Arizona to Sisters, Oregon. (Admin. Dkt. 475).

7. On August 9, 2016, Ms. Sneva and R&G filed the *Second Amended Disclosure Statement* (the "Disclosure Statement") (Admin. Dkt. 480) and the Plan. The Plan was confirmed by the Court on September 16, 2016. (Admin. Dkt. 544). According to the Disclosure Statement, R&G was in the second year of a five-year contract with the USFS to provide services for locations in Lancaster, CA, Corona, CA, and Grand Junction, CO (Admin. Dkt. 480 at 11).

8. The Plan included an agreement reached with World Dining, which provided that World Dining would pledge its secured debt and additional cash as capital contributions in exchange for a 72.5% equity interest in the reorganized R&G. (Admin. Dkt. 481 at 21-22). Ms. Sneva would retain a 27.5% interest in the reorganized entity.

9. The Plan provided that Ms. Sneva would be replaced as President and CEO of the reorganized R&G, but would continue to be employed by R&G for a period of ten years pursuant to the terms and conditions of the Agreement, wherein Ms. Sneva was to be employed "as the assistant to the President and CEO of the Company." (Admin. Dkt. 481 at 31; TE 1).

10. The effective date of the Plan and the Agreement was October 1, 2016 (the "Effective Date"). (Admin. Dkt. 544 at 3).

**B.    The Employment Agreement**

The Agreement established Ms. Sneva's base salary at $125,000 per year for a period of ten years commencing on the Effective Date, subject to prior termination as provided in the Agreement. The Agreement also provides that in addition to the base salary, the Company committed to make certain plan payments related to Ms. Sneva's confirmed Plan. (TE 1 at §§ 3-4). Ms. Sneva was further eligible to receive both performance-based bonuses and equity

distributions arising from her retained 27.5% ownership interest in the reorganized R&G. (TE 1 at § 6; Admin. Dkt. 481 at 31).

Pursuant to the terms of the Agreement, and in her capacity as assistant to the President and CEO of the reorganized R&G, Ms. Sneva was "responsible for tasks assigned by the President and CEO of the Company, subject to the general supervision and pursuant to the orders, advice, and direction of the Company." (TE 1 at § 1, ¶ A).

Under Section One of the Agreement, Ms. Sneva was required to:

> [a]t the direction of the CEO, . . . provide her professional expertise to the Company as reasonably necessary, to review and assist business affairs, make and maintain business contacts, and assist with future contract planning. . . . perform such other duties as are customarily performed by one holding such position in other, same, or similar businesses or enterprises as that engaged in by the Company in accordance with the policies, objectives, decisions, instructions and/or directives of the Company, as the same may be specified, designated, modified or established from time to time by the Company's CEO and/or Officers of the Company. . . . and . . . render such other and unrelated services and duties as may be assigned to [her] from time to time by the Company.

(TE 1 at § 1, ¶¶ A-B).

Section Two of the Agreement required that Ms. Sneva:

> at all times faithfully, industriously, and to the best of her ability, experience, and talents, perform all of the duties that may be required of and from her pursuant to the express and implicit terms of this Agreement, to the reasonable satisfaction of the Company.

(TE 1 at § 2). This section goes on to provide that Ms. Sneva would render such duties "over the telephone or in such place or places as the Company shall in good faith require or as the interest, needs, business, or opportunity of the Company shall require." (TE 1 at § 2).

Section Five of the Agreement provides that Ms. Sneva could "from time to time . . . incur various business expenses customarily incurred by persons holding positions of like responsibility, including, without limitation, necessary travel and similar expenses incurred for

the benefit of [the] Company and pursuant to the Company's directions." (TE 1 at § 5). This section states, in part, that:

> [s]ubject to the Company's policy and prior approval by the President and/or CEO regarding the reimbursement of such expenses as in effect from time to time during the term of this Agreement, which does not necessarily allow reimbursement for all such expenses, the Company shall reimburse [Ms. Sneva] for such reasonable out-of-pocket business-related expenses that [she] incurs in connection with her services for the Company, at [her] request, and on presentation by [Ms. Sneva] of appropriate vouchers and receipts for such expenses to the Company.

(TE 1 at § 5). The parties further agreed that failure to obtain prior approval by the CEO and/or President may result in no reimbursement of such expenses. (TE 1 at § 5).

Section Ten of the Agreement provided R&G with the right to terminate Ms. Sneva at any time "for cause," which is defined to include the following circumstances:

> 2.    Employee shall have materially breached any material provision of this Agreement, which breach has not been cured within 10 business days after receiving written notice of such breach,
>
> 3.    Employee shall have failed, refused, or neglected, other than by reason of a Disability (as defined . . .), to timely perform any material duty or obligation under this Agreement or to comply with any reasonable and lawful directive of the Chief Executive Officer (the "CEO") that is consistent with the terms of this Agreement, which failure, refusal, or neglect has not been cured within 10 business days after receiving written notice,
> . . . .

(TE 1 at § 10, ¶ A).

If R&G were to terminate Ms. Sneva for cause, R&G would be relieved of any responsibility to pay Ms. Sneva's salary, bonuses, or plan payments. (TE 1 at § 10, ¶ A). Additionally, under such scenario, Ms. Sneva would be "required to sell any and all shares of the

Company in accordance with the terms and conditions of the Company shareholder agreement." (TE 1 at § 10, ¶ A).

The Agreement further provides at Section Thirteen that if R&G were to terminate Ms. Sneva "for any reason other than death or Cause," Ms. Sneva would be entitled to payment of accrued salary, plan payments, bonuses, unused vacation time, and un-reimbursed expenses, plus her salary, plan payments, and bonuses for the remainder of the initial ten-year term of the Agreement as severance. (TE 1 at § 13, ¶¶ A-B).

The Agreement also contains non-compete and non-solicitation provisions, which apply if termination is for any reason other than voluntary by Ms. Sneva (TE 1 § 13). The Agreement was fully integrated. (TE 1 at § 9). It was also unique in that no other R&G employee was similarly situated in terms of employment contract type or role within the Company. (*See* 3/21/2018 Trial Tr. 55:3-7).[4]

### C.  Reorganized R&G

Pursuant to the Shareholder Agreement the reorganized R&G initially had five shareholders: Ms. Moulton, Ms. Sneva, Mr. Campagna, Ms. Lippert, and Mr. Williams. (3/20/2018 Trial Tr. 20:11-17; TE 3 at 1). Ms. Moulton was, and may still be, the single largest shareholder of the reorganized R&G, holding approximately 42% of R&G's shares. (3/20/2018 Trial Tr. 15:1-5).

Mr. Moulton was initially both the President and CEO of the reorganized R&G, and he remained CEO during Ms. Sneva's period of employment. (3/20/2018 Trial Tr. 58:21-23, 69:22-70:3; *see also* TE 3 at ¶ 2(c); TE 207 at ¶ 3.1). As the assistant to the President and CEO, Ms. Sneva was initially the assistant to Mr. Moulton. (3/20/2018 Trial Tr. 89:1-10; TE 1; TE 253 at Bates 108).

Although Mr. Moulton was generally knowledgeable about the food services industry, he acknowledged that he did not have any experience in the emergency food services industry. (3/20/2018 Trial Tr. 167:18-22). Mr. Moulton acknowledged that he had stepped in to run R&G,

---

[4] References to the trial transcripts are by page and line number. For example, "3/21/2018 Trial Tr. 8:2-4" would refer to page 8, lines 2-4 of the trial transcript from March 21, 2018.

a business in an industry in which he had never been involved, in the context of a bankruptcy case, a process in which he had never been involved. (3/20/2018 Trial Tr. 170:24-171:1). Mr. Moulton declined to hold a transition meeting with Ms. Sneva and Mr. Linscott, although transition meetings with other personnel did take place. (3/20/2018 Trial Tr. 140:16-20, 141:20-25; 3/21/2018 Trial Tr. 6:2-4).

Mr. Moulton and Ms. Sneva were, however, in constant communication regarding the business prior to the Effective Date. (3/20/2018 Trial Tr. 66:13-18; 3/22/2018 Trial Tr. 39:7-40:5, 41:3-43:6; TE 63). Mr. Moulton testified that he was trying to get Ms. Sneva's expertise by "picking her brain." (3/21/2018 Trial Tr. 9:12-13).

Nevertheless, on October 5, 2016, four days after the Effective Date, R&G issued a letter to Ms. Sneva informing her that she had breached the Agreement and threatening termination "for cause" if she failed to cure certain defaults. (TE 4). Mr. Moulton authorized the letter to be issued because he believed Ms. Sneva had misappropriated Company funds, added herself back on as a signatory on Company bank accounts, and reactivated her Company debit card without authorization. (3/20/2018 Trial Tr. 93:9-95:8, 190:22-191:19).

On October 6, 2016, Ms. Moulton, Mr. Moulton, and Ms. Sneva met for the first time to discuss Ms. Sneva's role as Mr. Moulton's assistant, and to address and resolve Mr. Moulton's issues regarding Ms. Sneva's use of Company funds and access to Company bank accounts. (3/20/2018 Trial Tr. 18:18-24, 19:6-8, 19:11-15, 96:9-25). Thereafter, all parties agreed that the concerns raised in the October 5 letter had been addressed. (*See* 3/20/2018 Trial Tr. 55:15-17, 192:20-21; 3/22/2018 Trial Tr. 50:9-13).

Consistent with their pre-Effective Date conduct, during the first eleven days post-Effective Date, Ms. Sneva and Mr. Moulton were in constant and direct communication. (3/20/2018 Trial Tr. 97:1-3; 3/21/2018 Trial Tr. 9:6-9; *see also* TE 62). During this time period, Ms. Sneva disagreed with a number of Mr. Moulton's business decisions and perceived some of his decisions as subjecting the Company to significant liabilities. (3/21/2018 Trial Tr. 11:1-4; 3/22/2018 Trial Tr. 139:15-141:10).

Mr. Moulton testified that Ms. Sneva's disagreements with his business decisions made it difficult for him to run the Company. (*See* 3/21/2018 Trial Tr. 11:9-12). On October 12, 2016, Mr. Moulton assigned Mr. Campagna to be Ms. Sneva's "single point of contact" and to serve as a "buffer" between himself and Ms. Sneva. (3/20/2018 Trial Tr. 98:8-99:1; 3/21/2018 Trial Tr. 9:1-5, 12:15-19; TE 5).

Mr. Campagna is a minority shareholder of the reorganized R&G and at the time this assignment was made, Mr. Campagna was not the President, CEO, or an employee of the reorganized R&G. (3/20/2018 Trial Tr. 97:19-98:4, 99:2-15; 3/21/2018 Trial Tr. 85:4-9; *see also* 3/21/2018 Trial Tr. 53:15-54:2, 86:13-23). Rather, Mr. Campagna was an employee of World Dining. (3/20/2018 Trial Tr. 98:5-6). Although Mr. Moulton testified that World Dining had entered into a management agreement with the reorganized R&G, such management agreement was never produced nor presented into evidence. (*See* 3/20/2018 Trial Tr. 99:10-15). Mr. Moulton testified that he would generate the assignments to be given to Ms. Sneva, and Mr. Campagna would relay those assignments to Ms. Sneva. (3/21/2018 Trial Tr. 11:17-20).

On November 1, 2016, in response to an email from Ms. Sneva, Mr. Moulton reiterated to Ms. Sneva that Mr. Campagna was her "single point of contact," and the only person within the management team with whom she should be communicating. (3/20/2018 Trial Tr. 101:21-102:19; TE 212). Mr. Moulton told Ms. Sneva that "[a]ny further emails, telephone calls, texts, or any other communication to any other member of the management team [would] be considered a breach of the [E]mployment [A]greement . . . ." (3/20/2018 Trial Tr. 101:21-102:19; TE 212).

In a November 3, 2016 email to Mr. Campagna, Ms. Sneva voiced her concerns regarding this communication ban, which she believed impeded her ability to effectively perform her job duties, and accused Mr. Moulton of harassment.[5] (3/20/2018 Trial Tr.105:5-109:19; 3/22/2018 Trial Tr. 69:25-70:15; TE 31).

Included in the November 3 email was a buy-out proposal from Ms. Sneva. (TE 31). Despite what Mr. Moulton characterized as a "toxic" relationship between himself and Ms.

---

[5] Mr. Moulton has denied all such allegations. (3/21/2018 Trial Tr. 15:1-3; *see also* 3/21/2018 Trial Tr. 19:1-2; TE 253 at Bates 73-79).

Sneva, Mr. Moulton testified that buying out Ms. Sneva was not an option given the proposed buyout amount and given that Mr. Moulton purportedly needed Ms. Sneva to help him run the reorganized R&G. (3/21/2018 Trial Tr. 11:11-12, 18:4-9).

In or around November 2016, a dispute arose regarding the calculation and timing of Ms. Sneva's salary and bonus (the "Salary and Bonus Dispute"). (3/22/2018 Trial Tr. 23:24-24:7). Both Ms. Sneva and the reorganized R&G employed counsel, and the Salary and Bonus Dispute was settled by a payment made to Ms. Sneva in full satisfaction of her claims. (3/21/2018 Trial Tr. 45:11-46:7, 181:2-7; 3/22/2018 Trial Tr. 11:24-12:10, 77:22-78:8, 160:6-14).

At a shareholder meeting in November 2016, Ms. Moulton was elected President of the reorganized R&G. (3/20/2018 Trial Tr. 21:14-16, 52:10-21; TE 207 at ¶ 4.1). Ms. Moulton, who remained President of R&G for the rest of Ms. Sneva's period of employment, testified that she was not involved in R&G's day-to-day business and had no responsibilities as President of R&G. (3/20/2018 Trial Tr. 15:25-16:3, 16:13; 49:15-19).

Like Mr. Moulton, Ms. Moulton testified that the reorganized R&G needed Ms. Sneva in order to succeed. (3/20/2018 Trial Tr. 56:20-21). In particular, R&G needed Ms. Sneva's knowledge about "how to run a fire, who to contact, and how to get it done." (3/20/2018 Trial Tr. 55:2-7).

Although Ms. Sneva was employed, in part, as assistant to Ms. Moulton, as President of R&G, Ms. Moulton testified that she did not need an assistant, did not treat Ms. Sneva as her assistant, and did not otherwise supervise Ms. Sneva. (3/20/2018 Trial Tr. 38:21-39:13, 54:12-13). When contacted by Ms. Sneva, Ms. Moulton, like Mr. Moulton, referred Ms. Sneva to Mr. Campagna as her point of contact. (3/20/2018 Trial Tr. 35:3-13; TE 27). Ms. Sneva nevertheless attempted to further communicate with Ms. Moulton on a number of occasions. (*E.g.*, TE 27; TE 28; TE 29). Ms. Moulton was the officer authorized to call special meetings of the Company and some of Ms. Sneva's attempted communications pertained to her concerns as a shareholder. (3/22/2018 Trial Tr. 17:8-22; TE 24; TE 29; TE 40; TE 207 at ¶ 2.2). At one point, Ms. Sneva was threatened with termination should she attempt to contact Ms. Moulton any further. (3/21/2018 Trial Tr. 106:16-107:6; TE 6 at Bates 936-937).

Ms. Sneva and her designated single point of contact, Mr. Campagna, communicated regularly via email and phone. (*See, e.g.*, TE 6 at Bates 929; TE 38; TE 45; TE 48; TE 50; TE 51). Ms. Sneva occasionally experienced connectivity issues, and testified that when she encountered connectivity issues at home, she would travel to various nearby locations in order to resolve such connectivity issues. (3/22/2018 Trial Tr. 165:5-25). Ms. Sneva generally responded to Mr. Campagna's emails promptly. (*See, e.g.*, TE 6 at Bates 929, Bates 933-34; TE 34; TE 232). Mr. Campagna and Ms. Sneva both testified that on occasion their communications became heated and/or unproductive. (3/22/2018 Trial Tr. 18:3-14, 157:23-158:4).

On December 26, 2016, Mr. Campagna threatened to take disciplinary action against Ms. Sneva, up to and including dismissal, in response to an email in which Ms. Sneva told Mr. Campagna that although she wanted to complete a particular assignment, she lacked the resources and information to complete such assignment. (TE 6 at Bates 922-923). On January 9, 2017, Mr. Campagna sent Ms. Sneva a second warning letter and related email. (3/21/2018 Trial Tr. 97:7-99:3; 3/22/2018 Trial Tr. 24:22-24; TE 6 at Bates 924-28).

In or about March 2017, R&G instituted a capital call, and as a result, Ms. Sneva's share percentage in R&G was reduced. (3/22/2018 Trial Tr. 25:19-23, 85:11-87:8; TE 247).

On or about April 1, 2017, Mr. Sneva, who had exited the Company in 2009 on or about the time of his divorce from Ms. Sneva, was hired to be General Manager of the reorganized R&G under the condition that he not have any supervisory role over Ms. Sneva. (3/21/2018 Trial Tr. 61:4-5, 62:11-12, 62:17-25, 75:21-76:5). After being employed by the reorganized R&G, Mr. Sneva often communicated directly with Mr. Moulton and Mr. Campagna. (3/21/2018 Trial Tr. 63:3-17). In his capacity as General Manager, Mr. Sneva traveled between Tucson and the fire units, and his travel was reimbursed by R&G. (3/21/2018 Trial Tr. 64:19-24).

On May 20, 2017, Ms. Sneva accused Mr. Campagna of continued harassment[6] and asked Ms. Moulton for a new supervisor/contact via email. (TE 28). Ms. Moulton testified that she did not respond to Ms. Sneva's email because "[Ms. Sneva] was not completing her work."

---

[6] Mr. Campagna has denied all such allegations. (*See* 3/21/2018 Trial Tr. 131:2-5, 180:5-10; 3/22/2018 Trial Tr. 14:10-12).

(3/20/2018 Trial Tr. 38:2-15). In response to the issues Ms. Sneva raised with respect to Mr. Campagna, Ms. Moulton testified that she "looked into it" and did not see any harassment in the emails between the two, although she could not speak to the content or appropriateness of any phone conversations given that she was not privy to such conversations. (3/20/2018 Trial Tr. 36:9-21).[7]

On May 22, 2017 and May 25, 2017, Ms. Sneva again accused Mr. Campagna of harassment and again asked Ms. Moulton for a new contact/supervisor. (TE 27; TE 47). At one point, Ms. Sneva asked that her ex-husband, Mr. Sneva, be assigned as her supervisor. (TE 47). Ms. Moulton told Ms. Sneva that Mr. Campagna was both her direct contact and the head of human resources. (3/20/2018 Trial Tr. 35:3-13; TE 27). Ms. Moulton reiterated to Ms. Sneva that she would forward any communication she received from Ms. Sneva to Mr. Campagna. (3/20/2018 Trial Tr. 35:7-13; TE 27). Ultimately, Ms. Moulton told Ms. Sneva that she would have to deal with Mr. Campagna regardless of whether she followed her instruction to communicate only with Mr. Campagna or whether she chose to follow the protocol in the Agreement.[8] (3/20/2018 Trial Tr. 36:5-8; *see also* TE 27).

On multiple occasions, Ms. Sneva, who was working remotely from her residence in Oregon, requested reimbursement for a business computer, business cellphone, and computer classes. (3/20/2018 Trial Tr. 45:4-10, 45:25-46:2; TE 44 at Bates 492, 494-95). Ms. Sneva was told by Mr. Campagna that R&G would not reimburse her for such expenses. (TE 44 at Bates 495; *see also* 3/22/2018 Trial Tr. 27:5-28:1). It was noted that Mr. Campagna was not reimbursed for similar expenses. (3/21/2018 Trial Tr. 39:18-40:2). At some point, Ms. Sneva purchased a computer and cell phone, both of which she used for work purposes, using personal funds. (*See* 3/22/2018 Trial Tr. 27:5-10, 87:23-88:1).

---

[7] Given Ms. Moulton's lack of involvement or knowledge of the day-to-day operations of the Company, the Court does not find her overall testimony compelling, or particularly useful.

[8] There is no protocol for reporting harassment in the Agreement. (*See* TE 1). The portion of the Employee Handbook that was presented into evidence directs an employee to report conduct she perceives as prohibited harassment to the General Manager if that employee's supervisor or the HR Manager is the person towards whom the complaint is directed. (TE 253 at Bates 129). Mr. Sneva was the General Manager at this time. However, Ms. Sneva was threatened with termination should she contact Mr. Sneva. (*See* TE 212).

On May 24, 2017, Mr. Campagna, who was himself working remotely, directed Ms. Sneva to report to the R&G Corporate Headquarters in Tucson, Arizona on June 5, 2017, because the Company did not feel as if the telecommuting arrangement was functioning to its satisfaction. (3/21/2018 Trial Tr. 64:16-18; TE 44 at Bates 495). Mr. Campagna testified that Ms. Sneva was ordered to report to Tucson for an undetermined period of time because she was not getting assignments done in a timely manner, was not sufficiently accessible, and needed access to equipment to perform her job. (3/21/2018 Trial Tr. 131:9-133:16, 226:4-12).

During this period of time, Ms. Sneva's daughter, who was in a high-risk pregnancy, was preparing to give birth in Oregon. (3/22/2018 Trial Tr. 88:23-89:3). Mr. Moulton and Mr. Campagna had learned of this pregnancy shortly after the Effective Date, and at least as of November 23, 2016, Ms. Moulton was also put on notice of this pregnancy. (3/20/2018 Trial Tr. 25:1-6, 104:6-12; 3/21/2018 Trial Tr. 40:25-41:1; 3/22/2018 Trial Tr. 61:11-62:3; TE 24; TE 26; TE 210). Furthermore, after Ms. Sneva was ordered to report to Tucson, Mr. Sneva had discussions with Mr. Moulton about the pregnancy and imminent birth. (3/21/2018 Trial Tr. 72:17-21).

Ms. Sneva's daughter had an emergency c-section on June 1, 2017, and Ms. Sneva did not report to work in Tucson on June 5, 2017. (3/22/2018 Trial Tr. 89:2-3; TE 6 at Bates 939). Ms. Sneva testified that she did not believe she needed to report to Tucson because she believed Mr. Sneva was intervening on her behalf. (3/22/2018 Trial Tr. 91:5-21). After failing to report on June 5, 2017, R&G advised Ms. Sneva that she had until June 19, 2017 to report to work in Tucson, and that her failure to do so would be considered insubordination resulting in disciplinary action up to and including termination. (See TE 16).

On June 5, 2017, the day Ms. Sneva was to report to Tucson, Ms. Sneva, working remotely, advised Mr. Moulton, Mr. Campagna, and Mr. Sneva to be prepared to mobilize to Grand Junction, Colorado, given the possibility of wildfires. (See TE 51). On June 10, 2017, Ms. Sneva sent a follow-up email emphasizing the need to be ready to mobilize, and on or about June 12, 2017, R&G received its first dispatch of the 2017 wildfire season to Grand Junction.

1  (3/21/2018 Trial Tr. 153:11-154:23; TE 52; TE 53). Around this time, Ms. Sneva's Tucson report

2  date was extended to June 19, 2017. (3/20/2018 Trial Tr. 120:6-10; TE 54 at Bates 556).

3      On June 14, 2017, Ms. Sneva offered to report to Tucson provided that she be reimbursed

4  for travel and lodging expenses. (3/20/2018 Trial Tr. 120:11-14; TE 15 at Bates 904). Ms.

5  Sneva's reimbursement request was denied despite the fact that Mr. Moulton believed it was

6  material and critical for the Company that Ms. Sneva be physically present in Tucson. (3/20/2018

7  Trial Tr. 120:15-16; 3/21/2018 Trial Tr. 58:12-21, 157:2-4). Ms. Sneva did not report to Tucson

8  on June 19, 2017. (*See* TE 16). Mr. Campagna was not going to be in Tucson when Ms. Sneva

9  was to report given that he moved to Texas in May 2017. (3/21/18 Trial Tr. 64:8).

10     **D.    The Termination**

11     On or about July 3, 2017, R&G issued a letter (the "Termination Letter") stating that Ms.

12  Sneva was being terminated "for cause" under the Agreement, with such termination to be

13  effective July 5, 2017. (3/20/2018 Trial Tr. 49:24-50:3, 81:1-82:4; TE 16). The Termination

14  Letter is signed by Mr. Campagna as "Managing Partner R&G Food Services Inc. dba Latitude

15  Catering[.]" (TE 16). Ms. Moulton testified that she and all of the other shareholders had met and

16  discussed their options, and she had agreed with the decision to terminate Ms. Sneva for cause.

17  (3/20/2018 Trial Tr. 50:12-51:4).

18     According to the Termination Letter, Ms. Sneva was terminated for cause under Section

19  Ten ¶ A2 of the Agreement, for materially breaching a material provision of the Agreement, and

20  Section Ten ¶ A3 of the Agreement, for failing, refusing, or neglecting to perform a material duty

21  or obligation under the Agreement or to comply with a reasonable and lawful directive of the

22  CEO consistent with the terms of the Agreement. (3/20/2018 Trial Tr. 82:2-4, 189:23-25; TE 16).

23  In the Termination Letter, R&G cites Ms. Sneva's poor work performance and failure to report

24  to work in Tucson as cause for her termination. (TE 16).

25     The Termination Letter was the last of at least eleven disciplinary warnings and/or threats

26  of termination given to Ms. Sneva during her nine-month period of employment with the

27  reorganized R&G. (*See* TE 4; TE 6; TE 16; TE 212).

28

(a)    <u>Work Performance</u>

Mr. Moulton testified that all the tasks he assigned Ms. Sneva were material and important for the Company, and tasks that needed to be done by Ms. Sneva. (3/21/2018 Trial Tr. 11:17-12:4). He further testified that he assigned the following never completed, or tardily completed, tasks to Ms. Sneva via Mr. Campagna: (a) obtain the contacts for the FEMA and Homeland Security offices in all 50 states via a Google search, and compile such contacts into a spreadsheet; (b) complete twice daily fire reports; (c) compile a lunch menu; and (d) establish new business contacts and develop business opportunities. (3/21/2018 Trial Tr. 31:12-14, 33:5, 34:11-12, 35:10-36:15, 37:1-5).

Ms. Sneva testified that she completed all tasks she was assigned to the best of her abilities. (3/22/2018 Trial Tr. 158:18-25).

i.    <u>The FEMA and Homeland Security Contact Assignment</u>

Ms. Sneva completed the FEMA and Homeland Security contact list assignment, albeit two months late. (3/22/2018 Trial Tr. 6:17-23). Ms. Sneva testified that she had difficulty completing the FEMA assignment because: (1) the direct contact information for FEMA directors and field agents is only available at certain conferences, and although she had attended one such conference as a representative of R&G, she had turned the contact information she had obtained at the conference over to another R&G employee; and (2) she had never created a computer spreadsheet. (3/22/2018 Trial Tr. 79:12-83:3, 88:10). Ms. Sneva testified that the spreadsheet with the general contact information for field offices that she was tasked with compiling, and did ultimately compile, was worthless given that the contact information published online is obsolete and/or of nominal value. (*See* 3/22/2018 Trial Tr. 79:16-82:20).

ii.    <u>The Fire Reports Assignment</u>

Ms. Sneva sporadically completed the assigned fire reports. (3/21/2018 Trial Tr. 35:10-13; 3/22/2018 Trial Tr. 8:18-9:5). She based her completion of such reports at least in part on whether or not there was fire activity on any particular day. (3/22/2018 Trial Tr. 173:25-174:2). Mr. Sneva, who was the General Manager, testified that the fire reports Ms. Sneva was assigned to complete were not useful because they were superfluous of readily available, regularly updated

third-party fire reports. (3/21/2018 Trial Tr. 68:16-24, 71:9-11, 78:17-20). Accordingly, by the time Ms. Sneva's morning fire reports came due at 7:00 am, Mr. Sneva and the unit managers had already read the third-party fire reports and were apprised of the fire conditions. (*See* 3/21/2018 Trial Tr. 68:20-22).

### iii. The Lunch Menu Assignment

Ms. Sneva did not complete the lunch menu assignment. (3/21/2018 Trial Tr. 36:14-15; 3/22/2018 Trial Tr. 10:19-20, 160:15-16). Ms. Sneva acknowledged that she could have compiled lunch menus. (3/22/2018 Trial Tr. 79:1-2). Because she lacked access to R&G employees and information about the designs of the various mobile units, Ms. Sneva indicated that any menus she would have generated would have been useless given what is required for menu planning. (3/22/2018 Trial Tr. 78:11-79:8, 172:5-21).

### iv. The New Business Contacts and Opportunities Assignment

Although Mr. Moulton testified that Ms. Sneva did not complete her assignment of establishing new business contacts and developing business opportunities, there was no testimony provided about the concrete nature of this assignment, and Ms. Sneva did in fact facilitate R&G's acquisition of its first fire contract of the 2017 fire season. (3/21/2018 Trial Tr. 37:1-5; 153:11-154:23; TE 51; TE 52; TE 53). Moreover, management for the reorganized R&G impeded Ms. Sneva's ability to further expand the Company's business contacts and opportunities by removing Ms. Sneva from the USFS contact list and by limiting her access to R&G employees and information. (*See* 3/21/2018 Trial Tr. 48:6-9; 3/22/2018 Trial Tr. 22:18-20, 78:24-79:1, 158:24-25, 161:16-18, 173:4; TE 20 at Bates 705; TE 34 at Bates 39; TE 228 at Bates 32).

### (b) Failure to Report

It is undisputed that Ms. Sneva was ordered to report to Tucson and did not do so. (*See* *supra* § IV B. ¶¶ 70-78).

## V. Legal Analysis & Conclusions of Law

### A. Breach of the Employment Agreement

Each party has accused the other of breaching the Agreement.

In an action for breach of contract, the party asserting the breach "has the burden of proving the existence of the contract, its breach and the resulting damages." *Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (Ariz. 1975). No party disputes the existence, validity, or applicability of the Agreement, and the parties have asked the Court only to determine liability, not damages, at this juncture. Accordingly, the Court need only determine whether either party has established breach of the Agreement.

      1.    <u>Breach of the Employment Agreement by R&G</u>

Ms. Sneva argues that R&G breached the Agreement by: (1) failing to make timely and accurate payments of her salary and bonus; (2) failing to reimburse her for reasonable expenses incurred and/or failing to provide advanced approval of reasonable requests for reimbursement; and (3) failing to employ her in the role for which she was hired and assign her duties and rights commensurate with that role.

      (a)    <u>Salary & Bonus Payments</u>

R&G argues that the parties settled the Salary and Bonus Dispute prior to trial with a payment made to Ms. Sneva in full satisfaction of the dispute, and that she is thus precluded by the doctrine of accord and satisfaction from raising this claim.

Accord and satisfaction is "a method of discharging a . . . cause of action, whereby the parties agree to give and accept something in settlement of the claim or demand of the one against the other, and perform such agreement . . . ." *Vance v. Hammer*, 105 Ariz. 317, 319, 464 P.2d 340, 342 (Ariz. 1970) (quoting *Green v. Huber*, 66 Ariz. 116, 119, 184 P.2d 662, 664 (Ariz. 1947)).

The elements of accord and satisfaction are: "(1) [a] proper subject matter, (2) competent parties, (3) an assent or meeting of the minds of the parties, and (4) a consideration." *Id.*, 105 Ariz. at 320, 464 P.2d at 343. Accord and satisfaction is an affirmative defense. *Leschorn v. Xericos*, 121 Ariz. 77, 79, 588 P.2d 370, 372 (Ariz. Ct. App. 1978) (quoting *Owens v. Hunter*, 91 Ariz. 7, 10, 368 P.2d 753, 755 (Ariz. 1962)). The party asserting accord and satisfaction has the burden of establishing each element. *Cf. Abner v. Arizona Newspapers, Inc.*, 11 Ariz. App. 237, 240, 463 P.2d 543, 546 (Ariz. Ct. App. 1970) ("An affirmative defense must be plead [a]nd

1     proved by the defendant.").

2       The settlement agreement reached by the parties was not offered into evidence. However,
3 Ms. Sneva testified that she settled the Salary and Bonus Dispute for a monetary sum in full
4 satisfaction of her claims. The parties are competent and were represented by counsel in the
5 context of the settlement negotiations, and they settled the Salary and Bonus Dispute with
6 consideration flowing from each side to the other. Accordingly, the Court finds that the doctrine
7 of accord and satisfaction bars Ms. Sneva from asserting this breach of contract claim.

8       (b)     <u>Failure to Reimburse for Reasonable Expenses</u>

9       Pursuant to Section Five of the Agreement, Ms. Sneva was permitted to "incur various
10 business expenses customarily incurred by persons holding positions of like responsibility,
11 including without limitation, necessary travel and similar expenses incurred for the benefit of the
12 Company and pursuant to the Company's directions."

13       During Ms. Sneva's period of employment with the reorganized R&G, no other person
14 held a position of like responsibility. The Court will, however, note that: (1) the reorganized R&G
15 paid the General Manager's business-related travel expenses; and (2) although there was much
16 emphasis during testimony about the fact that Mr. Campagna was not reimbursed for his various
17 business-related expenses, the Court finds such testimony irrelevant given that Mr. Campagna
18 was not an employee of the reorganized R&G.

19       Section Five of the Agreement further provides that "[s]ubject to the Company's policy
20 and prior approval by the President and/or CEO . . . the Company shall reimburse [Ms. Sneva]
21 for such reasonable out-of-pocket business-related expenses that she incurs in connection with
22 her services for the Company, at [her] request, and on presentation by [Ms. Sneva] of appropriate
23 vouchers and receipts for such expenses to the Company."

24       On numerous occasions, Ms. Sneva requested prior approval to be reimbursed for a work
25 computer, work cellphone, and various business-related travel expenses. Under the terms of the
26 Agreement, reimbursement was subject to both unspecified Company policies and the approval
27 of the President and/or CEO. Based on the testimony presented at trial, neither the President nor
28 CEO gave Ms. Sneva prior approval to be reimbursed for any requested business-related

expenditures.

Although Section Five of the Agreement entitled Ms. Sneva to incur reasonable business-related expenses with the expectation of being reimbursed for such expenses were she to obtain prior approval, nothing in the Agreement required the President and/or CEO to reimburse Ms. Sneva for any expenses or approve a reimbursement request if certain conditions were met.

Accordingly, the Court finds that R&G did not technically breach Section Five of the Agreement by refusing to reimburse Ms. Sneva for business-related expenses.

    (c)    <u>Failure to Employ in Role for Which Hired & Failure to Assign Duties Commensurate With Such Role</u>

Ms. Sneva was employed "as the assistant to the President and CEO of the Company." Ms. Sneva was responsible for "tasks assigned by the President and CEO of the Company, subject to general supervision and pursuant to the orders, advice, and direction of the Company" and was employed primarily to provide the Company with her professional expertise.

Eleven days after the Agreement went into effect, Ms. Sneva was ordered to have no further contact with R&G's President and CEO, Mr. Moulton. After Ms. Moulton became President of R&G, Ms. Sneva was instructed to have no further contact with Ms. Moulton. In sum, at all times during her employment, Ms. Sneva was employed as the assistant to Mr. and/or Ms. Moulton, yet in short order, she was instructed not to contact either of them under any circumstances.

The Moultons assert that they assigned Mr. Campagna to serve as a conduit, and to act as a buffer between themselves and Ms. Sneva. The Court finds this assertion disingenuous. Ms. Sneva was threatened with termination were she to contact the people whom she was explicitly employed to assist.

Furthermore, the tasks Ms. Sneva was assigned were largely misaligned to her strengths, as such strengths were identified by the Moultons. The Moultons testified that they needed Ms. Sneva's knowledge about the industry, specifically how to coordinate and operate at the wildfire sites, whom to contact, and how to complete the wildfire projects. However, Mr. Moulton, via Mr. Campagna, assigned Ms. Sneva the tasks of: (1) creating a largely worthless spreadsheet with

general contact information for FEMA offices; (2) completing superfluous fire reports; (3) creating a lunch menu that would likely have been of minimal value given Ms. Sneva's lack of access to Company information; and (4) generally establishing new business contacts and developing business opportunities, which Ms. Sneva attempted to do, but which she was largely impeded by the Company from doing.

Accordingly, the Court finds that the reorganized R&G failed to employ Ms. Sneva in the role for which she was hired and failed to assign her duties commensurate with such role, in breach of Section One of the Agreement.

2.    Breach of Employment Agreement by Ms. Sneva

R&G argues that Ms. Sneva breached the Agreement by failing to perform tasks assigned by the Company and by failing to report to Tucson.

(a)    Failure to Perform Tasks

Pursuant to Section One ¶ A of the Agreement, Ms. Sneva was responsible for "tasks assigned by the President and CEO of the Company, subject to general supervision and pursuant to the orders, advice, and direction of the Company." Ms. Sneva was responsible for "provid[ing] her professional expertise to the Company as reasonably necessary, to review and assist business affairs, make and maintain business contacts, and assist with future contract planning."

Section One ¶ B of the Agreement required Ms. Sneva to perform "such other duties as are customarily performed by one holding such position in other, same, or similar businesses or enterprises." Additionally, Section One ¶ B contains a catch-all provision that required Ms. Sneva to "render such other and unrelated services and duties as may be assigned to [her] from time to time by the Company."

Mr. Moulton testified that he, as CEO of the reorganized R&G, generated all the assignments given to Ms. Sneva. Ms. Sneva admittedly did not complete twice-daily fire reports or the lunch menu assignment. She did, however, ultimately complete all other assignments, although she completed some assignments late.

The outstanding fire report and lunch menu assignments were not tasks that would have required or allowed Ms. Sneva to provide her professional expertise to the Company given that

the evidence indicates that the fire reports she was tasked with generating were superfluous of extant, regularly updated third-party fire reports, and given that R&G-imposed restrictions on Ms. Sneva's access to information prevented Ms. Sneva from generating a lunch menu of value tailored to R&G's mobile facilities. Thus, these outstanding assignments could not have been assigned in accordance with Section One ¶ A of the Agreement. Furthermore, Ms. Sneva held a unique position in the Company and no evidence was presented to suggest that others holding similar positions in like businesses would have been assigned comparable assignments. Accordingly, these outstanding assignments must have been assigned in accordance with the catch-all provision in Section One ¶ B of the Agreement.

Although these outstanding assignments may have been trivial and may have ultimately led to final products of little to no value had they been completed, the outstanding assignments were nonetheless tasks assigned by the CEO of the Company, tasks Ms. Sneva was technically capable of completing, and tasks that were within the expansive purview of Section One ¶ B of the Agreement.

For these reasons, the Court finds that Ms. Sneva technically breached Section One of the Agreement by failing to complete twice-daily fire reports and the lunch menu assignment.

(b)     <u>Reporting to Tucson</u>

The parties agreed that Ms. Sneva would render her duties "over the telephone or in such place or places as the Company shall in good faith require or as the interest, needs, business, or opportunity of the Company shall require."

It is undisputed that Ms. Sneva was ordered to report to work at the R&G Headquarters in Tucson and did not so report. According to R&G shareholders and management, Ms. Sneva was ordered to report to work in Tucson because she was not performing her duties remotely to the reasonable satisfaction of the Company.

When Ms. Sneva was ordered to report to Tucson, Ms. Sneva's daughter was in a high-risk pregnancy and was preparing to give birth in Oregon, as Mr. Moulton and other management were aware. The emails entered into evidence show that Ms. Sneva was generally capable of effective and productive remote communication, and after being ordered to report to Tucson, Ms.

Sneva continued to provide her professional expertise to the Company remotely by preparing R&G for a fire dispatch that proved successful. Further, Ms. Sneva ultimately agreed to report to Tucson if provided with housing and travel accommodations, but R&G refused to reimburse Ms. Sneva for housing and travel expenses despite deeming it material that Ms. Sneva physically report to R&G Headquarters in Tucson. Finally, it is unclear what purpose would have been served in having Ms. Sneva in Tucson, given that she was prohibited from communicating with either the President or CEO, and given that Mr. Campagna was not located in Tucson, as he had moved to Texas in May 2017.

Based on the timing and circumstances, it is clear that R&G did not require Ms. Sneva to report to Tucson in good faith, and there was no interest, need, business, or opportunity of the Company that would have otherwise required Ms. Sneva to report to work in Tucson.

Accordingly, the Court finds that Ms. Sneva did not breach the Agreement by failing to report to Tucson.

### B. Breach of Implied Covenant of Good Faith and Fair Dealing

Each party has accused the other of breaching the implied covenant of good faith and fair dealing.

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 201 Ariz. 474, 490, 38 P.3d 12, 28 (Ariz. 2002), *as corrected* (Apr. 9, 2002). "The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to [a] contract from receiving the benefits and entitlements of the agreement." *Id.*

"A party may breach an express covenant of the contract without breaching the implied covenant of good faith and fair dealing." *Id.*, 201 Ariz. at 491, 38 P.3d at 29. Conversely, a party may breach the implied covenant of good faith and fair dealing without breaching an express provision in the contract. *Id.*

"The duty of good faith extends beyond the written words of the contract." *Id.* A party that retains power or discretion under the express terms of a contract can exercise that power or discretion in such a way so as to deny the other party to the contract a reasonably expected benefit

of the bargain, thereby breaching the implied covenant of good faith and faith dealing. *Sw. Sav. & Loan Ass'n v. SunAmp Sys., Inc.*, 172 Ariz. 553, 558, 838 P.2d 1314, 1319 (Ariz. Ct. App. 1992). A party that exercises its retained contractual power for a reason beyond the risks the other party assumed when entering into the contract, or for a reason inconsistent with the other party's justified expectations likewise breaches the implied covenant of good faith and fair dealing. *See id.*, 172 Ariz. at 559, 838 P.2d at 1320.

Ultimately, "[w]hether a party has breached the covenant of good faith and fair dealing is a question of fact." *Maleki v. Desert Palms Prof'l Properties, L.L.C.*, 222 Ariz. 327, 333, 214 P.3d 415, 421 (Ariz. Ct. App. 2009).

### 1. R&G's Conduct

Days after the Agreement became effective, R&G threatened Ms. Sneva with termination and barred Ms. Sneva from contacting the President, CEO, or any member of the management team other than Mr. Campagna for any reason, at any time. This prohibition severely impeded Ms. Sneva's ability to complete the tasks she was assigned and render the professional expertise she was employed to provide. R&G undermined Ms. Sneva's abilities to perform in accordance with and receive the benefits flowing from the Agreement.

In addition, R&G exercised its power to refuse Ms. Sneva's reasonable requests for reimbursement of business-related expenses, which conduct in effect gutted the reimbursement of expenses provision set forth in Section Five of the Agreement, and which conduct was inconsistent with Ms. Sneva's justified expectations.

R&G's final directive that Ms. Sneva report to Tucson at her own expense at a time when R&G officers knew her daughter was nearing the end of her high-risk pregnancy was pretextual in nature and likely calculated to lead to Ms. Sneva's termination or resignation, either of which would benefit the Company. It is the view of this Court that this demand put Ms. Sneva in an untenable position, which could be deemed harassment.

The reorganized R&G, through the actions of its management, failed to treat Ms. Sneva honestly, fairly, and in good faith, and thus breached the implied covenant of good faith and fair dealing.

1    2.    Ms. Sneva's Conduct

Based on the testimony and evidence before the Court, Ms. Sneva acted honestly, fairly, and in good faith in the scope of her employment. Although Ms. Sneva's communications with R&G officers and shareholders were heated or unproductive at times, it appears that Ms. Sneva was committed to revitalizing R&G. Given that her ability to perform under the confirmed Plan hinged on the payments she received pursuant to the Agreement, Ms. Sneva's future depended on the success of the reorganized R&G and on her continued employment with the Company.

Further, although Ms. Sneva breached the Agreement by failing to complete certain assigned tasks, such tasks were immaterial, and there was no evidence presented that her failure to complete such tasks was motivated by ill will or an improper motive. Ms. Sneva attempted to provide the Company with her professional expertise, which is what she was hired to do.

For these reasons, the Court finds that Ms. Sneva did not breach the implied covenant of good faith and fair dealing.

**C.    Termination For Cause**

R&G asserts that it terminated Ms. Sneva for cause under Section Ten ¶¶ A2 and A3.

1.    Section Ten ¶ A2

Section Ten ¶ A2 of the Agreement authorized R&G to terminate Ms. Sneva for cause if she materially breached any material provision of the Agreement and did not timely cure such breach.

The Court has already established that Ms. Sneva breached Section One of the Agreement by failing to complete the tasks she was assigned. Ms. Sneva did not cure this breach. Thus, R&G was permitted to terminate Ms. Sneva for cause under Section Ten ¶ A2 if: (1) the breach was material; and (2) the breached provision of Section One is a material provision of the Agreement.

(a)    Materiality of Breach

"Under Arizona law, a material breach occurs when (1) a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions or (2) fails to do something required by the contract which is so important to the contract that the breach defeats the very purpose of the contract." *Biltmore Bank of Arizona v. First Nat. Mortg. Sources, L.L.C.*,

No. CV-07-936-PHX-LOA, 2008 WL 564833, at *6 (D. Ariz. Feb. 26, 2008).

Section 241 of the Restatement (Second) of Contracts identifies five factors for courts to consider when determining whether a breach is material:

> (a)  the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b)  the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c)  the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d)  the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e)  the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981); *see also Found. Dev. Corp. v. Loehmann's, Inc.,* 163 Ariz. 438, 446, 788 P.2d 1189, 1197 (Ariz. 1990) ("adopt[ing] these standards for determining the triviality or immateriality of a breach in the landlord-tenant context"); *Biltmore Bank of Arizona*, 2008 WL 564833, at *6 (applying the Restatement factors to determine the materiality of a breach in the context of a wholesale broker agreement).

As discussed above, Ms. Sneva breached the Agreement by failing to complete twice-daily fire reports and by failing to compile a lunch menu pursuant to the catch-all provision in Section One ¶ B of the Agreement, which required Ms. Sneva to "render such other and unrelated services and duties as may be assigned to [her] from time to time by the Company."

However, Ms. Sneva did not fail to perform a substantial part of the Agreement by failing to complete these outstanding tasks. Furthermore, Ms. Sneva's failure to abide by the catch-all provision in Section One ¶ B of the Agreement is not a provision that is so crucial to the Agreement that her breach thereof can in anyway be said to have defeated the purpose of the Agreement.

Ms. Sneva was hired first and foremost to provide R&G with her professional expertise. Ms. Sneva did just that by, among other things, steering R&G towards securing its first dispatch

of the 2017 fire season. Further attempts by Ms. Sneva to impart her professional expertise were quashed by R&G management and shareholders.

R&G was not deprived of any benefit which it could reasonably have expected to derive given that Ms. Sneva's completion of twice-daily fire reports and a lunch menu would not have conferred much, if any, benefit on the Company. Accordingly, R&G has not suffered any meaningful loss as a result of Ms. Sneva's breach. Additionally, as discussed above, Ms. Sneva's performance comported with the standards of good faith and fair dealing.

As a result, the Court finds that Ms. Sneva did not materially breach the Agreement by failing to complete all fire reports and the lunch menu assignment.

    (b)   <u>Materiality of Breached Provision</u>

Even if Ms. Sneva's breach were deemed material, the catch-all provision Ms. Sneva breached is, by its very nature as a catch-all-provision, not a material provision of the Agreement.

Given that neither the provision Ms. Sneva breached nor the breach itself was material, the Court finds that R&G was not authorized to terminate Ms. Sneva for cause pursuant to Section Ten ¶ A2 of the Agreement.

    2.   <u>Section Ten ¶ A3</u>

Section Ten ¶ A3 of the Agreement authorized R&G to terminate Ms. Sneva for cause if she "failed, refused, or neglected . . . to timely perform any material duty or obligation under this Agreement or to comply with any reasonable and lawful directive of the [CEO] that [was] consistent with the terms of this Agreement," and failed to cure such failure, refusal, or neglect.

R&G asserts that it terminated Ms. Sneva for cause pursuant to Section Ten ¶ A3 because Ms. Sneva failed to report to work at R&G's Tucson office.

    (a)   <u>Failure, Refusal, or Neglect to Timely Perform Material Duty or Obligation</u>

Although R&G asserts that Ms. Sneva was ordered to report to work in Tucson because she was not performing her duties remotely to the reasonable satisfaction of the Company, the evidence shows that Ms. Sneva was generally capable of effective and productive remote communication and that Ms. Sneva continued to effectively and productively communicate with her single point of contact even after she was ordered to report to Tucson. Furthermore, as

discussed in detail above, the reorganized R&G provided no genuine material reason for ordering Ms. Sneva to report to work in Tucson.

The Court therefore finds and concludes that Ms. Sneva did not fail to perform any material duty or obligation by failing to report to R&G Headquarters in Tucson.

(b) <u>Failure to Comply with Reasonable and Lawful Directive of CEO Consistent with Terms of Employment Agreement</u>

As discussed above,[9] Mr. Moulton's directive, made through Mr. Campagna, that Ms. Sneva report to work in Tucson was not a reasonable directive.

Given that Ms. Sneva's obligation to report to work in Tucson was not a material obligation, and given that Mr. Moulton's directive that Ms. Sneva report to work in Tucson was not a reasonable directive, the Court finds that R&G was not authorized to terminate Ms. Sneva for cause pursuant to Section Ten ¶ A3 of the Agreement.

## VI. Conclusion and Ruling

Based upon the foregoing factual and legal analysis, and in consideration of the totality of the evidence presented, the Court finds and concludes that: (1) R&G breached Section One of the Agreement by failing to employ Ms. Sneva in the role for which she was hired and assign her tasks commensurate with such role; (2) Ms. Sneva breached Section One of the Agreement by failing to complete twice-daily fire reports and a lunch menu, as assigned, but such breach was not material; (3) R&G breached the implied covenant of good faith and fair dealing by undermining Ms. Sneva's abilities to perform in accordance with and receive the benefits flowing from the Agreement; (4) Ms. Sneva did not breach the implied covenant of good faith and fair dealing; and (5) R&G did not have grounds to terminate Ms. Sneva for cause.

The foregoing constitutes the Courts' ruling regarding the issues of liability. Counsel for the Plaintiff may upload a form of order consistent with this decision. The Court will set further proceedings to deal with the determination of damages to which Ms. Sneva is entitled.

DATED AND SIGNED ABOVE.

---

[9] *See supra* Section V.A.2.(b).